628 F.2d 70
 202 U.S.App.D.C. 70, Energy Mgt. P 26,186
 UNITED STATES of America
v.
EXXON CORPORATION, a corporation, Appellant.
UNITED STATES of America
v.
SHELL OIL COMPANY, a corporation, Appellant.
UNITED STATES of America
v.
MARATHON OIL COMPANY, a corporation, Appellant.
 Nos. 80-1002, 80-1003 and 80-1018.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 13, 1980.
Decided Feb. 25, 1980.
Certiorari Denied May 27, 1980. See 100 S.Ct. 2940.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Miscellaneous Nos. 79-0149, 79-0150, & 79-0217).
 Donald B. Craven, Washington, D.C., with whom Mark L. Evans, Washington, D.C., was on the brief, for appellant Exxon Corp. A. M. Minotti, entered an appearance for appellant Exxon Corp.
 Robert W. Steele, Washington, D.C., with whom J. Wallace Adair and Robert E. Hebda, Washington, D.C., were on the brief, for appellant Shell Oil Co.
 Daniel Joseph, Washington, D. C., with whom Warren E. Connelly, Washington, D. C., and William M. Berenson, Boston, Mass., were on the brief, for appellant Marathon Oil Co.
 Thomas R. Kline and Ann F. Cohen, Attys., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and William G. Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee. H. Robert Field, Atty., Dept. of Energy, Washington D. C., also entered an appearance for appellee.
 Before WRIGHT, Chief Judge, BAZELON, Senior Circuit Judge, and WILKEY, Circuit Judge.
 Opinion for the court per curiam.
 
 
 1
 Dissenting opinion filed by Circuit Judge WILKEY.
 
 PER CURIAM:
 
 2
 These are appeals from a District Court order of December 19, 1979 enforcing identical administrative subpoenas duces tecum against three oil companies: Exxon Corporation, Shell Oil Company, and Marathon Oil Company. We affirm the District Court's enforcement of the subpoenas, subject to a protective order as discussed below.
 
 
 3
 On May 9, 1978 Congress passed the Petroleum Marketing Practices Act (PMPA), 15 U.S.C. § 2801 et seq. (Supp.1979), Title III of which directs the Secretary of Energy, in consultation with the Federal Trade Commission (FTC), the Justice Department, and other appropriate agencies, to conduct a study of subsidization of wholesale and retail motor fuel sales by vertically integrated oil companies. Id. § 2841.[1] The Secretary delegated to the Director of the Office of Competition of the Department of Energy (DOE) his purported power to issue subpoenas to obtain information for the Title III study, and on January 22, 1979 the Director served on these appellants subpoenas for a broad range of documents related to subsidization.[2]
 
 
 4
 Appellants have challenged the subpoenas on several grounds, most notably: (1) DOE's subpoena power under Title III can derive only from Title III itself, the language of which is silent on subpoena power, and the legislative history of which demonstrates congressional intent that DOE have no subpoena power for the Title III study. (2) The general grants of subpoena power to DOE in the Department of Energy Organization Act (DOEOA), 42 U.S.C. § 7101 et seq. (Supp. I 1977), and the Federal Energy Administration Act (FEAA), 15 U.S.C. § 761 et seq. (Supp. I 1977), cannot provide subpoena power for an agency function which, like the subsidization study, stands outside and was mandated subsequent to these general acts. (3) Even if the general grant of subpoena power under the DOEOA, 42 U.S.C. § 7255 (Supp. I 1977), could apply to a later-mandated agency function, that section, which incorporates the subpoena power granted the FTC under 15 U.S.C. § 49 (1976), applies only to narrowly focused agency investigations of specific legal violations, not open-ended studies. (4) In denying administrative review of the subpoenas, DOE violated its own regulations, the Administrative Procedure Act, and the due process clause. (5) The subpoenas are too broad and burdensome to meet the demands of legitimate purpose and relevancy.
 
 
 5
 Judge Penn rejected the oil companies' claims, holding that DOE had subpoena power for the Title III study under DOEOA. We agree. Title III of PMPA rather obviously makes no provision for subpoena power for the subsidization study.[3] Our analysis of DOEOA, however, reveals that DOE did not need a special grant of subpoena power for this specific study. Rather, Title III specifically instructs DOE to conduct a study which the agency would in any event be permitted to conduct under its broad general DOEOA mandate. Thus, DOE can rely on the subpoena power in Section 7255.[4] We address this issue first, because it lays the premise for our analysis of the oil companies' legislative history argument.
 
 DOEOA provides in 42 U.S.C. § 7255:
 
 6
 For the purpose of carrying out the provisions of this chapter, the Secretary, or his duly authorized agent or agents, shall have the same powers and authorities as the Federal Trade Commission under Section 49 of Title 15 (the FTC's subpoena power) with respect to all functions vested in, or transferred or delegated to, the Secretary or such agents by this chapter.
 
 
 7
 In creating DOE, Congress expressly sought to achieve effective management of energy resources, promote consumer interests by ensuring an ample and reasonably priced supply of energy, and foster the economic health of small businesses engaged in energy production. Id. § 7112. The statute mandates appointment of eight Assistant Secretaries with such responsibilities as promoting competition and setting regulations for consumer protection. Id. § 7133(a)(7). The Secretary must create an Energy Information Administration (EIA) for
 
 
 8
 carrying out a central, comprehensive, and unified data and information program which will collect, evaluate, assemble, analyze, and disseminate data and information which is relevant to energy resource reserves, energy production, demand, and technology, and related economic and statistical information, or which is relevant to the adequacy of energy resources to meet demands in the near and longer term future for the Nation's economic and social needs.
 
 
 9
 Id. § 7135(a)(2). The statute also vests the EIA Administrator with the very broad duties the FEAA had assigned to the Administrator of the Office of Energy Information Administration under 15 U.S.C. § 790 et seq. (Supp. I 1977), including the task of maintaining information on the economic structure of energy supply systems. Id. § 790a(b). Finally, the DOEOA requires the Secretary to make an annual report on the effectiveness of competitive and regulatory practices of government and private entities. 42 U.S.C. § 7267(5) (Supp. I 1977).
 
 
 10
 The specific study required by Title III falls well within the range of administrative inquiry which these provisions of DOEOA place within DOE's power. We find no reason why the phrase "by this chapter" in Section 7255 cannot include an agency function lying within the powers granted by that chapter, but reinforced by a specific subsequent legislative mandate. Thus, DOE's performance of the Title III study is a legitimate means of "carrying out the provisions of this chapter" within the meaning of Section 7255.
 
 
 11
 Since DOE thus already possessed subpoena power for a general study of subsidization when Congress passed Title III, that statute's silence on subpoena power would seem to be of no consequence; Congress would have had to build into Title III a clear withdrawal of subpoena power if it did not want DOE to issue subpoenas for the Title III study. The oil companies point to the legislative history of Title III and to grants of subpoena power in related legislation to argue that Congress intended to do just that. We disagree.
 
 
 12
 The heart of the legislative history argument is a pair of remarks by Senator Bumpers, the sponsor of Title III. The remarks arose during debate on a proposed amendment to Title III offered by Senator Kennedy. That amendment, incorporating the confidentiality section of the Energy Supply and Coordination Act, 15 U.S.C. § 796(d) (Supp. I 1977), would have barred disclosure of certain information DOE obtained from the oil companies as confidential, except for requiring disclosure upon request to the Justice Department, the FTC, and other listed agencies. Senator Bumpers objected vigorously to the Kennedy amendment, apparently construing it as giving these other agencies access which they would otherwise lack to DOE-obtained information. Senator Bumpers believed that the oil companies' fear of adverse use of such information by the other agencies would chill their willingness to comply voluntarily with DOE requests for Title III information. Apparently, he felt that such voluntary compliance was crucial because he assumed that DOE would have no subpoena power under Title III. See 124 Cong.Rec. S7155 (daily ed. May 9, 1978).[5]
 
 
 13
 The debate on the Kennedy amendment is clouded by confusion on both sides as to what changes the amendment would make in the status quo. Despite this confusion, it does appear clear that Senator Bumpers thought there would be no subpoena power under Title III. Nevertheless, we do not see how Senator Bumpers' express or implied view can alter our own view of DOE's general subpoena power here. First, "(t)he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). Second, even if Senator Bumpers did believe that DOE would have no subpoena power under Title III, that belief was really unnecessary to his argument against the Kennedy amendment. Senator Bumpers wanted to encourage voluntary compliance with Title III. Under the severe time constraints Title III was to impose on DOE, voluntary compliance would be extremely desirable, even if DOE retained a fall-back subpoena power. Therefore, the context of Senator Bumpers' remarks weakens their significance as evidence of intent on the subpoena issue. Moreover, the fact that his assumption that DOE would have no subpoena power was unnecessary to his position on the Kennedy amendment may explain why no Senators rose to challenge that assumption; it was simply not centrally relevant to the debate. In fact, so far from believing the goal of voluntary compliance and the presence of a residual subpoena power inconsistent, Congress may well have thought the two complementary. Since the focus of the Title III study is the possibility of predatory subsidization of motor fuel sales by the oil companies, Congress may have assumed the residual subpoena power to be necessary to encourage agreements effecting voluntary compliance. Without the brooding threat of such subpoena power, Congress might reasonably have feared that the oil companies' willingness to participate in the study would be less than overwhelming.
 
 
 14
 The oil companies nevertheless invoke the hoary principle of expressio unius est exclusio alterius to buttress their view of congressional intent. First, whereas Title III of PMPA never mentions subpoena power, Title II, which requires accurate disclosures of motor fuel octane ratings, expressly grants subpoena power to the FTC. 15 U.S.C.A. § 2823(a) (Supp.1979). Second, Congress expressly gave subpoena power to the DOE itself in such other specific statutes as the Powerplant and Industrial Fuel Use Act, 42 U.S.C.A. § 8301 et seq. (Supp.1979), and the Emergency Energy Conservation Act of 1979, Pub.L.No.96-102.
 
 
 15
 These congressional actions might, among many other factors, provide some evidence on the issue of congressional intent, but they are hardly decisive. The structure of Title II differs markedly from that of Title III. Title II is primarily a directive to private parties to fulfill general reporting requirements imposed by the Act. Title II, however, secondarily establishes the FTC as the enforcing agency, and Congress may have felt a need to spell out the FTC's enforcement powers in some detail. Title III, in contrast, is primarily a directive to a government agency, the Department of Energy, and Congress may reasonably have understood Title III to incorporate DOE's general enforcement powers from the DOEOA.
 
 
 16
 As for the Powerplant and Energy Conservation Acts, the grants of subpoena power there may well have been the product of "uncertainty, understandable caution, and a desire to avoid litigation." Nat'l Petroleum Refiners Ass'n v. FTC, 482 F.2d 672, 696 (D.C.Cir.1973). The oil companies' expressio unius argument remains highly speculative. Moreover, since Section 7255 had already given DOE subpoena power for a study like that directed in Title III, for us to accept the oil companies' argument we would have to read the combination of their legislative history and expressio unius theories as proof of repeal or amendment by implication. The Supreme Court has cast grave doubt on such inferences, TVA v. Hill, 437 U.S. 153, 189-190, 98 S.Ct. 2279, 2299-2300, 57 L.Ed.2d 117 (1978), and its suspicions would be especially justified here where the inference would be based not on any language in Title III itself, but on a stray remark in the legislative history and questionable reference to other statutes.
 
 
 17
 The oil companies nevertheless argue that 15 U.S.C. § 49 (1976), the FTC Act provision on which the Section 7255 subpoena power is based, allows the agency to issue subpoenas only as part of narrowly focused investigations of specific parties suspected of specific legal violations, and not as part of broad inquiries into the possibility of legal violations throughout an industry or into industry conduct not currently illegal which might warrant fresh administrative or legislative action. We find nothing in the FTC Act or in the judicial history of Section 49 or Section 7255 to support this distinction.
 
 The key provision in the FTC Act states:
 
 18
 For the purposes of this subchapter the Commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any person, partnership, or corporation being investigated or proceeded against; and the Commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. * * *15 U.S.C. § 49 (1976). Although the section might put some limit on FTC orders of access, the rather laconic phrase "relating to any matter under investigation" describing the scope of the subpoena power hardly suggests the study-investigation distinction argued by the oil companies. Moreover, the language of other related sections of the FTC Act argues directly against this distinction. Section 46, in granting substantive powers to the FTC, clearly uses the verb "investigate" to describe broad administrative functions involving studies or inquiries which logic would force the oil companies to place on the "study" rather than on the "investigation" side of their distinction. See id. § 46(a), (h).
 
 
 19
 Moreover, of the numerous cases cited by the oil companies to support their distinction, none is on point. Some involve judicial construction of the very particular terms of a wholly different statute, like the Internal Revenue Code. United States v. Bisceglia, 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975); United States v. Humble Oil & Refining Co., 488 F.2d 953 (5th Cir. 1974), vacated, 421 U.S. 943, 95 S.Ct. 1670, 44 L.Ed.2d 97 (1975), reinstated on remand, 518 F.2d 747 (5th Cir. 1975). Other cited cases simply uphold subpoenas issued pursuant to law enforcement investigations without judging the validity of subpoenas issued for other purposes. United States v. Bell, 564 F.2d 953 (TECA 1977); United States v. Empire Gas Corp., 547 F.2d 1147 (TECA 1976), cert. denied, 430 U.S. 915, 97 S.Ct. 1326, 51 L.Ed.2d 592 (1977). And FTC v. Baltimore Grain Co., 284 F. 886 (D.Md.1922), aff'd per curiam, 267 U.S. 586, 45 S.Ct. 461, 69 L.Ed. 800 (1925), involved not a subpoena, but an order of access.
 
 
 20
 To the extent that these cases might accumulate into some amorphous general congressional belief in the study-investigation distinction, they are easily offset by numerous cases cited by DOE which suggest, at least generally, the absence of such a distinction. With no controlling precedent, we revert to the language and scheme of the FTC Act, and find no grounds for the oil companies' theory.[6]
 
 
 21
 The oil companies' procedural objections to the subpoena merit little attention. Appellants claim that under the DOE regulations for review of agency subpoenas, 10 C.F.R. § 205.8 (1979), DOE was required to entertain their motion to quash. DOE points in response to Section 205.1 of the regulations, which purportedly limits the subpoena review regulations to subpoenas issued as part of the specific agency functions described in 10 C.F.R. §§ 209-214 (1979), into none of which categories falls the subsidization study. Whether the reference to Sections 209-214 in Section 205.1 is inclusive or exclusive may not be obvious, but an agency is entitled to very broad deference when it construes its own regulations, Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and we see no reason to disagree with DOE here.
 
 
 22
 As for other procedural arguments, the oil companies offer no sound authority for their view that either the Administrative Procedure Act or due process requires the agency to promulgate review regulations for all agency subpoenas. See United States v. Firestone Tire & Rubber Co., 455 F.Supp. 1072, 1080 (D.D.C.1978). Northern California Power Agency v. Morton, 396 F.Supp. 1187 (D.D.C.1975), on which the oil companies rely, did not involve subpoenas, but complex ratemaking matters which, in the court's view, required regulations to help the parties obtain review of massive technical data. Moreover, in that case court review would be limited to the agency record, which the court thought would be enhanced by new regulations. In a subpoena enforcement, by contrast, the District Court can inquire into all relevant matters, unlimited by the scope of the agency's own inquiry, if any. In any event, we find no evidence that the oil company did not have a reasonable hearing on its challenges to the subpoenas in the District Court, and so we find no reason to impose new procedural rules on the agency.[7]
 
 
 23
 Finally, we find that the subpoenas were reasonably relevant to the agency's legitimate statutory purpose and imposed no undue burden on the oil companies. Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Marathon makes the rather novel argument that the Secretary should first collect documents on subsidization and only if he finds evidence of this practice proceed to seek information on the possibly predatory motive behind it. But nothing in the statute or its legislative history suggests in any way that Congress intended this study to be conducted in stages; its tight deadline suggests quite the contrary.
 
 
 24
 We thus conclude that as a matter of law the DOE acted within its statutory power in issuing the Title III subpoenas. Nevertheless, we uphold their enforcement subject to the precise terms of a protective order. Since the enforcement of a subpoena is an independent judicial action, and not merely an action ancillary to an earlier agency action, ICC v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 (1894), a court is free to change the terms of an agency subpoena as it sees fit. Flotill Products, Inc. v. FTC, 278 F.2d 850, 852 (9th Cir. 1960).
 
 
 25
 DOE originally issued subpoenas to nine oil companies, including, in addition to the appellants, Ashland Oil Company, Atlantic Richfield Oil Company, Clark Oil & Refining Company, Gulf Oil Corporation, Standard Oil Company of Indiana, and Texaco, Inc. These latter six companies, however, avoided enforcement of the subpoenas by coming to agreements with DOE providing for voluntary submission of documents relevant to the Title III study with special protection for certain documents designated by the companies as "confidential" or "extremely confidential." Under these agreements, "confidential" documents in DOE hands would remain in special locked files, while "extremely confidential" documents would generally remain in the companies' possession and thus never become agency records subject to public disclosure under the Freedom of Information Act. The gist of these protections is set out in the attached Protective Order. In settling with the six other companies, DOE apparently believed that these protections put no serious constraints on the Title III study. DOE has not shown any reason why the appellants do not need similar protection, and in fact, in an effort at settling after oral argument in this case, expressly offered equivalent confidentiality terms to appellants. We therefore find it appropriate to modify the subpoenas to incorporate the essential confidentiality provisions of these earlier agreements.[8]
 
 
 26
 Subject to the attached Protective Order, the judgment of the District Court is
 
 
 27
 Affirmed.
 
 PROTECTIVE ORDER
 I. Production of Documents
 
 28
 By March 3, 1980 Exxon Corporation, Shell Oil Company, and Marathon Oil Company (hereinafter referred to as company) shall produce all documents specified in the subpoenas issued on January 22, 1979 by William C. Lane, Jr. of the Department of Energy (DOE), subject to the provisions for confidential treatment set forth below.
 
 II. Confidentiality
 
 29
 (A) Each company shall designate in good faith at the time of production of documents or information pursuant to this Protective Order those items that it claims to be "Confidential" in that they contain proprietary, trade secret, or other confidential information. Each company may also designate a reasonable number of documents and information each company deems to be "Extremely Confidential" in that they contain proprietary, trade secret, or other confidential information of such a significant and confidential nature that their release may have an extremely adverse effect on the company's competitive business position. A designation by each company as "Confidential" or "Extremely Confidential" is not a declaration of the agency of such designation. Documents designated as being "Extremely Confidential" shall be made available for examination by personnel assigned to the Title III study from the Office of Competition (O/C), the Department of Justice (DOJ), the Federal Trade Commission (FTC), and any other agency as designated by the Secretary for participation in the Title III study at the offices designated by each company in Washington, D.C. In the event any of the above-listed agencies reasonably determines that physical possession of a copy of a document labeled "Extremely Confidential" is necessary, those agencies may make a request for such a copy, which request the company shall not unreasonably refuse.
 
 
 30
 (B) In the event that copies are made of, or notes are taken concerning, such "Extremely Confidential" documents by any person examining the documents, such copies and notes shall be treated as "Extremely Confidential" documents within the meaning of that term as it is used in this Protective Order.
 
 
 31
 (C) In the event that O/C, DOJ, FTC, or any other agency designated by the Secretary for participation in the Title III study determines that physical possession of the notes from, or a copy of, a company document labeled "Extremely Confidential" is necessary for the completion of the Title III study, pursuant to Subparts (A) and (B) of this Part, or if, upon examination of such documents for Title III purposes, another law enforcement purpose is evident, such document may be requested for such use. If so requested, such agency shall provide the following continuing protections for the confidentiality of such notes or documents, as well as for documents labeled "Confidential" or notes taken from such "Confidential" documents:
 
 
 32
 (1) All such documents and notes, as well as drafts and manuscripts of the Title III study, shall be secured in a locked file cabinet when not in use and in a room which is locked when not in use or such other facilities as will provide comparable security.
 
 
 33
 (2) A log, available to the company upon request, shall be maintained by all individuals that have access to "Confidential" documents of that company.
 
 
 34
 (3) A separate log, available to the company upon request, shall be maintained for "Extremely Confidential" documents which shall show on a document-by-document basis who has possession of such document.
 
 
 35
 (4) Individuals granted access to "Confidential" or "Extremely Confidential" documents of a company shall be informed of the status of these documents and the limitations on their use and such individuals, other than attorneys employed by O/C, DOJ, FTC, and other agencies designated by the Secretary for participation in the Title III study, shall sign an acknowledgment of their understanding of these limitations in the form attached as Exhibit A. A copy of the executed undertaking shall be made available to the company.
 
 
 36
 (5) All "Confidential" and "Extremely Confidential" material shall be returned to said locked file cabinets at the end of each working day.
 
 
 37
 (D) In the event O/C, FTC, or any other agency designated by the Secretary for participation in the Title III study determines that any of a company's documents labeled "Extremely Confidential" are not necessary to the Title III study, that agency shall immediately return such documents to the company. Provided, however, that if upon examination of such document for Title III purposes another law enforcement purpose is evident, such document may be kept for such use.
 
 
 38
 (E) Any government agency having possession of documents produced under this Protective Order may share those documents with any other government agency that agrees to abide by the terms of this Protective Order.
 
 
 39
 (F) Nothing in the Protective Order shall be construed as precluding or limiting disclosure:
 
 
 40
 (1) pursuant to a valid subpoena or court order;
 
 
 41
 (2) pursuant to a request formally authorized by a committee or subcommittee of Congress with jurisdiction over the subject matter of the documents or information requested;
 
 
 42
 (3) at the direction of the Office of Management and Budget under 44 U.S.C. § 3502 et seq.
 
 
 43
 (G) Any agency having possession of any documents obtained under this Protective Order shall promptly notify a company of all requests for disclosure under the Freedom of Information Act of any document or information produced by a company under this Protective Order, including requests for disclosure that would be permitted hereunder, and the basis therefor, and shall also give the company the maximum actual notice reasonably possible, and not less than ten days' notice (unless compelled by court order or lawful subpoena to disclose the document in less than ten days), of any intended disclosure. The notice period shall run from the date on which the company actually receives such written notice. No agency shall exercise any discretion it may have under the Freedom of Information Act to release otherwise exempt material provided by any company.
 
 
 44
 (H) Portions of the draft report on the Title III study which contain or summarize information from "Confidential" or "Extremely Confidential" documents shall be treated in the same manner as other "Confidential" or "Extremely Confidential" documents under this Protective Order. In addition O/C will send to a company those portions of the final draft of such report which cite or summarize "Confidential" or "Extremely Confidential" documents at least ten days prior to public release of the report and provide the company with an opportunity to comment on O/C's intended use prior to release of such report.
 
 
 45
 (I) At the conclusion of O/C's Title III study, any agency in possession of any documents obtained under this Protective Order shall immediately return to a company all documents or information produced by that company pursuant to this Protective Order (and all copies of such documents or information) which are not referenced in or relied upon to prepare the Title III study or which are not, having been examined for the Title III study, necessary for a law enforcement purpose. In any event, all documents will be returned to a company within four (4) years from the completion of the Title III study unless being kept for a law enforcement purpose.
 
 
 46
 (1) All documents and information not immediately returned or released to a company pursuant to Subpart (I) of this Part shall continue to be maintained by the agency in possession in the same manner as provided in Subpart (C) of this Part until returned.
 
 
 47
 (2) All notes taken from a company document labeled "Extremely Confidential" shall be destroyed by the agency in possession when the report of the Title III study is submitted to Congress, unless being kept for a law enforcement purpose.
 
 
 48
 (J) O/C, DOJ, FTC, or any other government agency designated by the Secretary may request and a company shall not unreasonably refuse the reclassification of any material designated either "Confidential" or "Extremely Confidential" which the agency believes may have been wrongly classified or which the passage of time may have made less sensitive. Such request of an agency shall specifically state the reasons for the request, including the intended use thereof.
 
 
 49
 (K) A company shall inform O/C of the person authorized to receive notification under this Protective Order.
 
 EXHIBIT A
 STATEMENT
 
 50
 ______________________________ hereby states:
 
 
 51
 (Name)
 
 
 52
 I reside at____________________________________
 
 
 53
 (Street Address)
 
 
 54
 in the City of______________________________,
 
 
 55
 (Name of City)
 
 
 56
 County of _______________________________________
 
 
 57
 (Name of County)
 
 
 58
 ________________ in the _______________________.
 
 
 59
 (Capacity) (Department or Agency)
 
 
 60
 I understand that I will have access to and be examining corporate documents of __(Company)__ which are of a hichly proprietary and confidential nature, and pledge that I, under no circumstances, shall remove any such confidential document from the control of __(Government Agency)__. Furthermore, I have read the Protective Order covering these documents and understand the limitations contained in those documents. I further understand that violation of the terms of the Protective Order may subject me to severe penalties under 18 U.S.C. Sec. 1905, including fines and imprisonment.
 
 Dated: ______________ _____________
 WILKEY, Circuit Judge, dissenting:
 
 61
 This case deserves, and has received, all possible expedition, so I record my disagreement with my colleagues' conclusion with unaccustomed brevity. I think the appellants are correct in their challenge to the subpoenas on points (1), (2), and (5) as stated in the third paragraph of the Per Curiam. On the face of the statute there is no subpoena power under Title III, there is admittedly not one word in the legislative history implying there is such a power, and there are words from two of the legislators most active on this statute saying flatly that no subpoena power exists for the Title III study, a repeated assertion which was repeatedly uncontradicted.
 
 
 62
 I agree, of course, with the imposition of the protective order.
 
 
 
 [1]
 The Title III study, which was to be completed within 18 months of enactment, is to cover the following subjects:
 (1) the role of vertically integrated operations in facilitating subsidization of sales of motor fuel at wholesale or retail;
 (2) the extent to which such subsidization is predatory and presents a threat to competition;
 (3) the profitability of various segments of the petroleum industry;
 (4) the impact of prohibiting such subsidization on the competitive viability of various segments of the petroleum industry, on prices of motor fuel to consumers and on the health and structure of the petroleum industry as a whole; and
 (5) such other matters as the Secretary considers appropriate.
 15 U.S.C.A. § 2841(b) (Supp.1979).
 
 
 [2]
 The subpoenas are set out in the Joint Appendix at 24-38
 
 
 [3]
 On the other hand, Title II of PMPA, which sets standards for accurate disclosure of motor fuel octane ratings, does expressly grant subpoena power to the FTC. 15 U.S.C.A. § 2823(a) (Supp.1979)
 
 
 [4]
 So holding, we agree with the District Court that there is thus no need to answer the somewhat more involved question whether FEAA provides yet another source of this subpoena power
 
 
 [5]
 Senator Bumpers' key remarks were as follows:
 * * * The Justice Department has subpena powers. If they are sure that something is going on that is wrong among major oil companies, they can subpena the information. They do not have to request it. They do not have to ask for their cooperation. Here we do. * * *
 * * * (Kennedy's) amendment has nothing to do with what kind of energy information (the other agencies) will get. They will get no more information under his amendment than under mine. They will not have the right to get the information under subpena powers either way. * * *
 
 
 [124]
 Cong.Rec. S7155, cols. 1, 2 (daily ed. May 9, 1978)
 
 
 [6]
 Appellants also rely on our recent decision in United States v. Iannone, 610 F.2d 943 (D.C.Cir.1979), as support for limiting DOE's general subpoena powers. We find the case easily distinguishable. In Iannone, Congress had given the Inspector General of DOE express power to subpoena documents but was silent on his power to subpoena live testimony. We held that grant of power to subpoena documents to be exclusive. There, however, we had a clear and focused expression of congressional intent with respect to the subpoena powers of a particular official. Moreover, our concern lay not with the general scope of DOE's subpoena power, but with problems of delegation of that power to that particular official. First, the Inspector General is supposed to be an independent officer within DOE, not an "agent" of the Secretary within the meaning of 42 U.S.C. § 7255. 610 F.2d at 946. Second, Congress has sought to create a comprehensive system of Inspectors General throughout the government, all with identical powers. Varying grants of subpoena authority to Inspectors General from agency heads would disrupt such a system. Plainly, none of the considerations in Iannone bear on this case
 
 
 [7]
 We find no merit and little coherence in Shell's claim that the District Court erred in denying it discovery in the enforcement proceeding, and in reaching the merits of the subpoena question in denying Shell's motion to dismiss, before Shell filed an answer. Except in extraordinary circumstances of the sort that are not apparent here, discovery is improper in a summary subpoena enforcement proceeding, United States v. Firestone Tire & Rubber Co., 455 F.Supp. 1072, 1078 (D.D.C.1978), and Shell appears to have had ample opportunity to present the District Court with all its objections to the subpoenas
 
 
 [8]
 The attached Protective Order is essentially the one submitted by DOE as part of its effort to settle the case after oral argument in this court. The government's settlement proposal appears to differ from the agreements reached with the nonlitigating oil companies in only two material ways, and we must presume it was these differences which deterred the appellants from settling. First, the government did not offer the appellants, as it did the nonlitigating companies, assurance that it would not exercise any discretion it possessed under Chrysler Corp. v. Brown, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), to release to the public any information otherwise exempt under the Freedom of Information Act. We think the public interest is not disserved by providing appellants this protection, so we include it in the Protective Order. Second, the earlier agreements had provided that if DOE shares any of its Title III information with the Justice Department or the FTC, those agencies are bound not to use such information unless it is elsewhere available for any purpose other than that of Title III itself. The nonlitigating oil companies thus obtained assurance that the other agencies could not use any such information as the basis for any independent legal actions against them. After those agreements were drawn, DOE received complaints from the Justice Department and the FTC that such provisions, forcing them to read Title III documents with one eye closed, so to speak, unduly inhibit them in their statutory law enforcement duties and were not in any event required by law. We agree. Appellants have not alerted us to any authority, either in general or in the text or legislative history of PMPA, for requiring such extraordinary protection. Thus, we are loath to make such protection part of our Protective Order, especially since Title III expressly provides for consultation between DOE and other agencies